IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TAYLOR HUNTER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HEALTH FIRST, INC.,

Defendant.
______________________________________/

CASE NO. ______________

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Taylor Hunter ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Health First, Inc. ("Health First" or "Defendant"), and alleges as follows based on personal knowledge as to Plaintiff's own acts and on information and belief as to all other matters:

## NATURE OF THE ACTION

1. This is a class action arising from Health First's collection and disclosure of website visitors' sensitive personal and health-related information and electronic communications to Google LLC ("Google"), Microsoft Corporation ("Microsoft"), LinkedIn Corporation ("LinkedIn"), Constant Contact, Inc. ("Constant Contact"), and Roku, Inc./DataXu ("DataXu") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies embedded in Defendant's website, www.hf.org (the "Website"). Health First's conduct is directly contrary to its explicit statement in its Privacy Policy that it does not transmit personally identifiable information to third parties.

2. Health First is Central Florida's only fully integrated health system. Founded in 1995 and headquartered in Rockledge, Florida, Health First operates four hospitals—Cape Canaveral Hospital, Holmes Regional Medical Center, Palm Bay Hospital, and Viera Hospital—and is home to Brevard County's only Level II Trauma Center. Health First also includes Health First Medical Group, the largest multi-specialty physician group on the Space Coast, and Health First Health Plans, which offers commercial and Medicare health insurance options across Central Florida. Through the Website, Health First enables users to research medical conditions and services, locate physicians and facilities, apply for and compare health coverage, select providers, and submit inquiries.

3. The Website functions as a health care–seeking and coverage-enrollment tool. Users run free-text searches for medical conditions and treatments; research specific services, providers, and facilities; and, through Health First's co-branded health-plan enrollment portal (defined below), navigate a health-coverage application, eligibility, and plan-comparison workflow that prompts them to disclose structured health and eligibility information—including age, sex, tobacco use, household income, changes in household size, qualifying life events, prescriptions, and preferred doctors, pharmacies, and hospitals. In each instance, users disclose sensitive information about their own health conditions and care needs, or those of the individuals for whom they seek care and coverage.

4. Unbeknownst to Website visitors, Health First has knowingly implemented tracking tools operated by multiple third-party recipients, including Google Ads and Google Analytics (operated by Google), the Microsoft/Bing advertising tag (operated by Microsoft), the LinkedIn Insight Tag (operated by LinkedIn), Constant Contact's tracking technology, and DataXu's demand-side advertising technology (now operated by Roku) (collectively, the

"Trackers" and each individually, a "Tracker"). The challenged tracking occurs on www.hf.org and on the Health First–branded enrollment experience at healthfirst.healthsherpa.com (the "Enrollment Portal"), which users reach as Health First's coverage-shopping and enrollment workflow. As alleged below, the captured requests and page content identify Health First plans and branding and transmit users' affirmative medical, provider, prescription, eligibility, and coverage communications together with persistent identifiers. On information and belief, Health First deployed, directed, authorized, configured, or caused the deployment of the challenged Trackers as part of that integrated workflow. When visitors run medical searches, navigate the coverage-application and plan-selection workflow, or research providers, the Trackers cause the Third-Party Recipients to acquire those communications in real time together with identifiers capable of persistently linking the activity to a browser, device, account, or user.

5. What aggravates Health First's conduct is the timing and manner of these disclosures. Users are never asked to agree to any terms and conditions before they interact with the Website, and are never presented with a cookie banner, pop-up, checkbox, or any clickwrap agreement. Instead, the Website transmits users' plain-text medical search queries, coverage-eligibility disclosures, provider and plan selections, and browsing activity to the Third-Party Recipients in real time as they occur. Health First's Privacy Policy appears only as a small-print hyperlink in the Website footer—where users have no occasion to encounter it before their information has already been intercepted and transmitted—and affirmatively represents that Health First does not use information users submit for marketing purposes without their knowledge and express consent.

6. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of (1) the Florida Security of

Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA"), and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA").

7. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Health First violated the FSCA by deliberately embedding tracking technologies on its Website that procured the Third-Party Recipients to intercept users' private electronic communications—including their plain-text medical search queries, coverage-eligibility disclosures, provider and plan selections, and condition-specific browsing—in real time, without the knowledge or consent of any party to those communications.

8. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Health First procured the interceptions for the purpose of committing a criminal or tortious act—specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

9. Independent of these statutory violations, Health First owed Plaintiff and Class Members a duty of confidence and breached it. Users disclosed their medical conditions, symptoms, care needs, prescriptions, provider preferences, and coverage and eligibility information to Health First in confidence, for the purpose of obtaining health information, treatment, and coverage from the health system they entrusted with that information. Health First accepted that trust and then disclosed that nonpublic information to the Third-Party Recipients—advertising and analytics companies with no role in furnishing users' care—without consent or

privilege. A breach of confidence claim lies for an unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.

10. Further, Health First solicited and obtained users' sensitive health-related and personal data and put that data to use for advertising, analytics, conversion-optimization, lead-generation, and enrollment purposes, without ever compensating users for the value it received. Health First has thereby been unjustly enriched at Plaintiff's and Class Members' expense.

11. Through this action, Plaintiff seeks to hold Health First accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

**PARTIES**

12. Plaintiff Taylor Hunter is an adult citizen and resident of the State of Florida, residing in Davenport, Florida.

13. Defendant Health First, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business at 6450 US Highway 1, Rockledge, Florida 32955, located in Brevard County. Founded in 1995, Health First is Central Florida's only fully integrated health system, operating four hospitals, the largest multi-specialty physician group in Brevard County (Health First Medical Group), and a health-insurance business (Health First Health Plans), employing approximately 6,150 people and generating approximately $2.8 billion in annual revenue. Health First develops, maintains, operates, and controls the Website, including the tracking technologies deployed on it.

## JURISDICTION AND VENUE

14. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges claims arising under federal law, namely the ECPA, 18 U.S.C. § 2511, *et seq*.

15. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

16. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant, which is a citizen of Florida.

17. This Court has personal jurisdiction over Defendant because Health First is a Florida corporation with its principal place of business in Rockledge, Florida, within this District, and operates and controls the Website from Florida. The acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

18. Venue is proper in the Orlando Division of the Middle District of Florida under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and maintains its principal place of business at 6450 US Highway 1, Rockledge, Florida, which is located in Brevard County within the Orlando Division. A substantial part of the events or omissions giving rise to the claims occurred in this District, because the tracking conduct at issue is deployed from Health First's centralized Website, which is operated, maintained, and controlled from this District, and the Website is accessible to and used by consumers throughout the District.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Healthcare Websites

19. Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, they are particularly concerning because they can capture sensitive medical information, including the types of care a user is researching, the providers a user is seeking, the conditions a user or a user's loved one may be experiencing, and the coverage and eligibility information a user discloses when applying for health insurance.

20. The interception of healthcare-related communications through these tracking technologies is especially problematic because it can reveal highly personal and sensitive medical conditions, treatment interests, coverage decisions, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

21. As detailed below, Health First has implemented tracking technologies on its Website that result in the Third-Party Recipients' unauthorized interception of visitors' electronic communications.

### B. The Tracking Technologies Deployed on the Website

22. Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its products and services, which it then leverages to deliver targeted advertisements. Health First has implemented Google's advertising and analytics technologies—including Google Ads and Google Analytics—on its Website.

23. Google Analytics is a web analytics service offered within the Google Marketing Platform that allows website operators to track visitors' actions on their website in order to measure traffic and engagement, personalize content, and implement targeted advertising. Google Ads is Google's advertising product, which uses conversion-tracking and remarketing tags to attribute user actions and build advertising audiences. Both are JavaScript-based tracking technologies that load automatically and immediately whenever a user visits a page containing the code, and execute in the background without any visible indication to the user.

24. Google's tracking technologies acquire and collect data points about user interactions with a website and transmit details of those interactions to Google (via requests to endpoints such as google-analytics.com and googleads.g.doubleclick.net). Along with these events, the trackers transmit persistent cookies and identifiers, including the _ga cookie and Google advertising cookies (such as __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, NID, and IDE). Those identifiers can enable Google to recognize and link activity associated with the same browser, device, or account across interactions and contexts. Where a user is signed into a Google account, Google may be able to associate transmitted activity with that authenticated account. As alleged below, Plaintiff was signed into Gmail during her searches, making the account-linkage allegation particularly concrete as to her. Whether standing alone or combined with account and other data available to Google, these persistent identifiers permit linkage of the transmitted communications and support the allegation that the disclosures were not anonymous.

25. Microsoft is a multinational technology company headquartered in Redmond, Washington. Microsoft collects user data through services including its Bing search and advertising network (Microsoft Advertising) and its Universal Event Tracking ("UET") tag. Health First has implemented Microsoft's advertising tag on its Website. When a user interacts with a

website that uses the Microsoft/Bing tag, information about the user's actions is automatically transmitted to Microsoft (via requests to endpoints such as bat.bing.com), together with the "MUID" (Microsoft User ID) cookie. The MUID is a persistent browser-level identifier capable of allowing Microsoft to recognize and link activity associated with the same browser across interactions and websites using Microsoft tracking technologies. The simultaneous transmission of substantive health-related communications and the MUID therefore permits persistent linkage of those communications, even where the request itself does not contain the user's name.

26. LinkedIn is a Microsoft-owned professional-networking and advertising company. The LinkedIn Insight Tag is a JavaScript tracker that website operators embed to enable conversion tracking, retargeting, and audience-building through LinkedIn's advertising platform. When a user interacts with a website that deploys the LinkedIn Insight Tag, information about the user's actions is transmitted to LinkedIn (via requests to endpoints such as px.ads.linkedin.com and snap.licdn.com), together with LinkedIn identifying cookies and identifiers (such as the li_fat_id, bcookie, and lidc cookies) that LinkedIn uses to associate the activity with a LinkedIn member or device and to deliver targeted advertising.

27. Constant Contact is a marketing-technology company that provides email marketing, digital advertising, and tracking services. Health First has implemented Constant Contact tracking technology on its Website, which transmits information about users' interactions to Constant Contact and enables Health First to associate Website activity with marketing and contact records for advertising and lead-generation purposes.

28. DataXu is a demand-side programmatic advertising platform now owned by Roku, Inc. and operated as part of Roku's advertising business. DataXu's technology enables the real-time collection of user interaction data and the delivery of targeted, programmatic advertising.

Health First has implemented DataXu tracking technology on its Website, which transmits information about users' interactions to DataXu/Roku, together with advertising identifiers used to build audiences and deliver targeted advertising.

29. Each of the Third-Party Recipients' privacy disclosures confirms that it uses the data it collects to advertise and market to users, including by targeting advertising and combining data collected from different contexts to build unified profiles.

**C. Health First Shares Users' Private Health Information with Third Parties**

30. Through the Website, users perform a range of activities, including running free-text searches for medical conditions and treatments; researching specific services, providers, and facilities; and navigating a health-coverage application, plan-comparison, and provider-selection workflow that prompts them to disclose structured health and eligibility information. In doing so, users communicate private and personal information via the Website, including protected health information ("PHI"). Unbeknownst to the Website's users, Health First surreptitiously shares this private and protected information with the Third-Party Recipients, without users' consent.

31. Specifically, and as documented in the figures below, Health First shares with the Third-Party Recipients, without users' knowledge or consent, the following categories of user communications: (i) plain-text medical search queries entered into the Website's search bar; (ii) structured coverage-eligibility disclosures entered into the Enrollment Portal, including age, sex, tobacco use, household income, changes in household size, and qualifying life events; (iii) provider-preference inputs, including preferred doctors, pharmacies, and hospitals; (iv) disclosed prescriptions and drug-name searches; (v) plan-comparison and plan-selection interactions; and (vi) the page URLs a user visits on the Website and the Enrollment Portal, which encode the

specific medical services, conditions, providers, prescriptions, and coverage options the user is researching.

32. When a user visits the Website, the user's browser sends an HTTP request to the Website's server to load the page. In response, the server returns the webpage, which contains small pieces of code known as trackers or tags. The trackers instruct the browser to send the user's interactions—along with identifying data such as cookies, browser details, and device information—to the Third-Party Recipients. As documented below, when a user interacts with the Website, the Trackers transmit the contents of those interactions, together with the user's unique identifying cookies, to the Third-Party Recipients in real time.

33. The transmissions described below are documented in the figures that follow, which are drawn from network-inspection captures and the corresponding HAR (HTTP Archive) files reflecting the real-time requests generated when a user interacts with the Website and the Enrollment Portal. For certain transmissions—principally those sent to LinkedIn—the captured request payloads are compressed (gzip-encoded and then Base64-encoded); the figures show those payloads both as transmitted and, using a standard decoding tool, as decoded into human-readable form.

### D. The Website Transmits Users' Plain-Text Medical Search Queries

34. The Website provides a search bar that allows users to search for medical conditions, treatments, services, providers, and facilities. When a user enters a medical condition or treatment into the search bar, the plain-text query is embedded directly into the page URL—for example, https://www.hf.org/search?search=cancer%20treatment. Upon execution of the search, tracking requests are triggered that transmit the user's query to the Third-Party Recipients in real time, together with the user's unique identifying cookies. The transmissions documented in the

following figures were captured using the browser's network-inspection tools and the corresponding HAR files, using the example search "cancer treatment."

35. The user's plain-text search query is transmitted in real time to Google's advertising service (www.googleadservices.com) as a conversion event, encoding the search URL (the "url" parameter, https://www.hf.org/search?search=cancer%20treatment) together with a Google advertising identifiers for both the users browser and the users google account ("auid" = 1097001383.1772023206 and "DSID"):




*Figure 1: The user's search-bar query for "cancer treatment" transmitted to Google Ads (www.googleadservices.com), encoding the search URL and the user's Google advertising identifiers (auid and DSID).*

36. The same search query is transmitted in real time to Google Analytics (analytics.google.com/g/collect) under the Website's Google Analytics measurement ID (G-

4W2XLZWESK), encoding the search URL (the "dl" parameter) together with the user's Google Analytics client identifier ("cid" = 57850091.1772023206):




*Figure 2: The user's search-bar query transmitted to Google Analytics (measurement ID G-4W2XLZWESK), encoding the search URL (dl) with the user's Google Analytics client identifier (cid).*

37. The same search query is transmitted in real time to Microsoft via the Bing Universal Event Tracking tag (bat.bing.com, tag ID 5738187), encoding the search URL (the "p" parameter) together with Microsoft session and visitor identifiers ("sid" and "vid"):




*Figure 3: The user's search-bar query transmitted to Microsoft/Bing (bat.bing.com, UET tag 5738187), encoding the search URL (p) with the user's Microsoft session (sid) and visitor (vid) identifiers.*

38. The same search query is transmitted in real time to Constant Contact (webtracking.dp.ctct.io), whose payload encodes the user's search term (in the "search," "search_params," and "url" fields) together with a persistent "anonymous_id" (845c2794-e355-4461-b283-edff40c4d962):



*Figure 4: The user's search-bar query transmitted to Constant Contact (webtracking.dp.ctct.io), encoding the search term and a persistent anonymous identifier (anonymous_id).*

39. The same search query is transmitted in real time to DataXu/Roku (tags.w55c.net) as a "PAGE_VIEW" conversion event, encoding the search URL (the "event_source_URL" field) together with advertising identifiers, including the user's Google Analytics client identifier and a DataXu identifier:




*Figure 5: The user's search-bar query transmitted to DataXu/Roku (tags.w55c.net), encoding the search URL (event_source_URL) with advertising identifiers.*

40. Through these transmissions, the Third-Party Recipients learn the specific medical conditions and treatments the user is researching, linked to persistent identifiers that permit the user to be identified and tracked across websites.

### E. The Enrollment Portal Transmits Users' Coverage-Eligibility, Provider, and Plan Selections

41. In addition to the Website, Health First offers health insurance through Health First Health Plans and operates a co-branded health-plan enrollment, eligibility, and plan-comparison portal for Health First Health Plans at healthfirst.healthsherpa.com (the "Enrollment Portal"). The Enrollment Portal is branded "HealthFirst Health Plans" and is presented to consumers as Health First's own coverage-shopping tool; its pages are titled "Health First Commercial Plans, Inc." On information and belief, the Enrollment Portal is operated by or on behalf of Health First, which deployed or caused to be deployed the tracking technologies described below.

42. The Enrollment Portal prompts users to disclose structured health and eligibility information in order to determine subsidy eligibility, compare plans, and select providers. The workflow prompts the user to disclose age, sex, tobacco use, eligibility status, changes in household size, household income, qualifying life events, prescriptions, and preferred doctors, pharmacies, and hospitals. As documented in the figures below, when the user makes these disclosures, tracking requests are triggered that transmit the user's inputs in real time to the Third-Party Recipients, principally LinkedIn and Google.

43. Many of these transmissions are sent to LinkedIn through the LinkedIn Insight Tag, which posts to px.ads.linkedin.com/wa/ with a compressed (gzip-encoded and then Base64-encoded) request payload. When decoded, these payloads reveal the user's specific disclosures, as shown below.

44. On the Enrollment Portal's "Who needs health coverage?" page, the user enters age (30) and sex (male) and selects "Tobacco user." Upon that selection, a LinkedIn Insight Tag request (px.ads.linkedin.com/wa/) fires carrying a compressed payload:




*Figure 6: The Enrollment Portal's "Who needs health coverage?" page, where the user selects "Tobacco user," triggering a LinkedIn Insight Tag request (px.ads.linkedin.com/wa/) with a compressed payload.*

45. Decoding that LinkedIn payload (a Base64 decode followed by gzip decompression) reveals that it captured the user's tobacco-use selection: a "CLICK" signal whose captured element text ("innerText") is "Tobacco user," on a page titled "Health First Commercial Plans, Inc.":




*Figure 7: The decoded LinkedIn payload, revealing a captured "CLICK" event with innerText "Tobacco user" on the Health First–branded Enrollment Portal.*

46. Decoding a further LinkedIn payload reveals the user's structured eligibility disclosures, including age ("applicants[][age]=30"), tobacco use ("applicants[][smoker]=true"), sex ("applicants[][gender]=male"), and household income ("household_income=50000"):




*Figure 8: The decoded LinkedIn payload, revealing the user's age, tobacco use (smoker=true), sex, and household income (household_income=50000).*

47. These LinkedIn requests carry the user's LinkedIn identifying cookies—including bcookie, li_sugr, lidc, li_mc, lms_ads, lms_analytics, AnalyticsSyncHistory, and UserMatchHistory—which LinkedIn uses to associate the disclosures with a LinkedIn member or device:




*Figure 9: The LinkedIn request's Cookie header, transmitting the user's LinkedIn identifying cookies (bcookie, li_sugr, lidc, UserMatchHistory, and others) alongside the health-eligibility disclosures.*

48. The Enrollment Portal likewise transmits the user's eligibility results. On the "You may qualify for savings!" page, which displays the user's estimated premium savings, a LinkedIn Insight Tag request fires carrying a compressed payload of the user's eligibility-results interaction:




*Figure 10: The Enrollment Portal's eligibility/savings-results page ("You may qualify for savings!"), triggering a LinkedIn Insight Tag request with a compressed payload.*

49. The Enrollment Portal also transmits these disclosures to Google Analytics. On the Special Enrollment / qualifying-life-event page, a Google Analytics request (measurement ID G-5MYD9R6Q0M) transmits the eligibility-results URL (the "dl" parameter), which encodes the user's household income ("household_income=50000") and tobacco use ("smoker=true"):



*Figure 11: The Special Enrollment page, where a Google Analytics request (measurement ID G-5MYD9R6Q0M) transmits the eligibility-results URL encoding household_income=50000 and smoker=true.*

50. On the "Do you have any preferred doctors, pharmacies, or hospitals?" page, the user selects a specific provider—here, "David Guel, Thoracic Surgery (Cardiothoracic Vascular Surgery), 217 Hillcrest St, Orlando, FL." That selection triggers a provider lookup (providers.json) and a LinkedIn Insight Tag request:




*Figure 12: The Enrollment Portal's provider-preference page, where the user selects Dr. David Guel, triggering a provider lookup and a LinkedIn Insight Tag request.*

51. Decoding the LinkedIn payload reveals the captured provider selection: a "CLICK" signal whose captured element text is "David Guel, Thoracic Surgery (Cardiothoracic Vascular Surgery), 217 Hillcrest St, Orlando, FL," together with the user's provider search ("name=David"), sex, household income, and the qualifying-life-event reason ("sep_reason=lost_coverage"):




*Figure 13: The decoded LinkedIn payload, revealing the user's selected provider (David Guel) along with the user's provider search, sex, household income, and qualifying-life-event reason.*

52. The same provider selection is transmitted to Google Analytics, which receives the provider-search URL and a corresponding event whose value is "David Guel, Thoracic Surgery (Cardiothoracic Vascular Surgery)":




*Figure 14: The user's provider selection transmitted to Google Analytics, encoding an event identifying the selected provider (David Guel).*

53. These Google Analytics transmissions carry the user's Google Analytics client identifier ("cid" = 1132925356.1772102277), tying the coverage-workflow disclosures to a persistent identifier:




*Figure 15: The Google Analytics request carrying the user's Google Analytics client identifier (cid) alongside the provider-search URL.*

54. Finally, on the plan-recommendation page ("We found the most affordable plan for you!"), a Google Ads request (googleads.g.doubleclick.net and www.googleadservices.com) transmits a URL encoding the user's full profile—including age, tobacco use ("smoker=true"), sex, household income ("household_income=50000"), prescription identifiers ("prescriptions[][rx_norm_identifier]=1094584"), a drug-name search ("query=neurophen"), and the user's provider name—together with a Google advertising identifier ("auid" = 1741313517.1772102277):



*Figure 16: The plan-recommendation page, where a Google Ads request transmits the user's full profile—age, tobacco use, sex, household income, prescription identifiers, a drug-name search, and provider name—with a Google advertising identifier (auid).*

55. Through these transmissions, the Third-Party Recipients—principally LinkedIn and Google—learn highly sensitive information affirmatively communicated by the user, including tobacco use, household composition and income, qualifying life events, prescriptions, drug searches, preferred providers, and the health coverage the user is applying for and comparing. The requests transmit those literal responses and selections alongside persistent cookies or client and advertising identifiers, permitting the recipients to associate the communications with the same browser, device, member, account, or user over time. As to Plaintiff's medical searches, the linkage allegation is stronger still because she was signed into her Google account when the Google advertising requests allegedly transmitted her literal search terms.

### F. Users' Browsing Activity Across the Website

56. The interception of users' electronic communications is not limited to the interactions described above. Every page URL a user visits on the Website—including pages describing medical conditions, services, providers, facilities, and coverage options—is transmitted

to the Third-Party Recipients in real time, together with their respective unique identifying cookies. Through these transmissions, the Third-Party Recipients learn not only that the user visited the Website, but the specific medical topics, conditions, providers, and coverage options the user was researching.

57. This Complaint focuses on the Third-Party Recipients identified above because those are the tracking systems documented here. Discovery may reveal additional third-party recipients or additional tracking products deployed on the Website, including additional advertising products within the Google Marketing Platform, Microsoft's advertising network, and other programmatic-advertising platforms.

### G. Defendant's Responsibility for the Interception of Electronic Communications

58. Although the Trackers perform the technical acquisition and transmission functions, Health First is alleged to be legally responsible under the FSCA and ECPA because it intentionally procured, enabled, directed, authorized, or caused the Third-Party Recipients to acquire the challenged communications.

59. Health First knowingly made the affirmative decision to implement the Trackers on www.hf.org. As to the Enrollment Portal, the Health First branding, Health First plan content, integration with Health First's coverage-shopping workflow, and the captured advertising and analytics requests support the inference that Health First directed, authorized, configured, or caused the challenged tracking to be deployed for its enrollment and marketing purposes. On information and belief, the challenged tracking would not have operated as part of the Health First enrollment experience and transmitted these communications for Health First's benefit absent Health First's authorization, configuration, procurement, or continued acceptance of that operation.

60. On information and belief, Health First controls, participates in controlling, or has contractual or practical ability to influence which pages and events in its Website and Health First–branded Enrollment Portal trigger tracking for Health First's advertising, analytics, and enrollment purposes. At minimum, Health First could elect not to procure or use tracking on sensitive functions—including its search function and the coverage-application, eligibility, plan-comparison, and provider-selection workflow, where tobacco use, household income, prescriptions, drug searches, and provider preferences are disclosed—yet the captured requests show tracking operating on precisely those functions.

### H. Health First's Privacy Disclosures Do Not Authorize the Tracking Conduct

61. Health First's Website includes a link to a Privacy Policy in the footer of the Website's pages. Users are not required to affirmatively agree to the Privacy Policy before running searches, navigating the coverage-application workflow, comparing plans, selecting providers, or otherwise interacting with the Website.

62. Far from authorizing the tracking conduct, Health First's Privacy Policy affirmatively represents the opposite. The Privacy Policy states that Health First "do[es] not use any information you send to us for marketing purposes (such as mailing lists) without your knowledge and express consent." A reasonable user reading this representation would understand that his or her sensitive personal and health-related information is not being shared with third-party advertising and analytics companies for marketing purposes—precisely the opposite of what Health First's tracking conduct accomplishes. The real-time transmission of users' plain-text medical search terms and structured coverage-eligibility, provider, and plan-selection inputs to multiple third-party advertising and analytics platforms is a marketing-related use and disclosure

beyond internal site functionality, and cannot be reconciled with Health First's express representation.

63. Even if enforceable, Health First's privacy disclosures do not operate as consent to Health First's use of the Trackers to intercept users' private health-related and personal information and transmit it to third-party advertising and analytics companies. Consent is limited to the specific conduct authorized, and a reasonable person would not understand a generic privacy policy—let alone one affirmatively stating that submitted information is not used for marketing purposes without express consent—to authorize the real-time interception and transmission of the user's medical search queries, coverage-eligibility disclosures, provider selections, and plan interactions to the Third-Party Recipients for advertising and analytics purposes.

64. Health First's privacy disclosures also cannot constitute consent because they are presented as a passive browsewrap arrangement. The Privacy Policy is accessible only through a small-print hyperlink in the Website footer, among numerous other links. For most of the class period—including when Plaintiff used the website—ue, and were deemed to "assent" merely by using the Website. Browsewrap terms are enforceable only where the hyperlink to the terms is conspicuous enough to put a reasonably prudent person on inquiry notice before engaging with the website. Health First's footer link fails this test.[1]

65. Health First maintains a public "Terms of Use" page that functions primarily as a website disclaimer and policy page. That page does not contain any mandatory arbitration clause or class-action waiver applicable to general Website visitors.

[1] Recently, Health First added a button users need to click "I agree" at the bottom of the page. The content of the Privacy Policy which users agree to falsely states: "We do not share, sell or trade any personally identifiable information you give us to other organizations."

**I. Health First's Conduct Violates HIPAA**

66. Health First holds itself out as a healthcare organization that owns and operates hospitals, a multi-specialty physician group, and a health plan; provides and coordinates medical care; and maintains information concerning patients' health conditions, care needs, coverage, and services sought. Health First publishes privacy materials on its Website reflecting that it recognizes obligations under HIPAA in connection with its role.

67. Health First is a covered entity under HIPAA within the meaning of 45 C.F.R. § 160.103. It is a health care provider that furnishes and bills for health care through its hospitals and physician group, and it operates a health plan (Health First Health Plans). As a covered entity, Health First is subject to HIPAA's prohibitions on the unauthorized use and disclosure of PHI. See 45 C.F.R. § 164.502(a). To the extent any component of the Website is operated on behalf of a separate covered entity, Health First also qualifies as a business associate under 45 C.F.R. § 160.103 and is independently subject to the same prohibitions. Health First's embedding of third-party tracking code that transmits PHI to the Third-Party Recipients is an unauthorized disclosure regardless of the precise capacity in which its HIPAA obligations arise.

68. PHI is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is health information that is (1) created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to an individual's past, present, or future physical or mental health or condition, or to the provision of or payment for health care; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified. 45 C.F.R. § 160.103.

69. When users interact with the Website and the Enrollment Portal—running medical searches; researching services, providers, and conditions; disclosing age, sex, tobacco use, household income, household changes, qualifying life events, prescriptions, drug searches, and provider preferences in the coverage workflow; and comparing and selecting health plans—they disclose information relating to the past, present, or future physical or mental health or condition of themselves or the individuals for whom they seek care and coverage, and to the provision of or payment for health care. This information is collected by Health First in the context of users seeking care and coverage and satisfies the first two prongs of the IIHI definition.

70. The cookies and device identifiers transmitted alongside users' health-related interactions support the allegation that the disclosures were individually identifiable rather than anonymous. HIPAA's de-identification provision treats a "unique identifying number, characteristic, or code" as an identifier that must be removed for information to qualify for the regulatory safe harbor. 45 C.F.R. § 164.514(b)(2)(i). The Google advertising cookies, Microsoft MUID, LinkedIn cookies, and client or advertising identifiers described above are persistent codes capable of linking the same browser, device, member, account, or user across interactions. When transmitted in the same requests as literal medical searches, coverage-eligibility responses, prescriptions, drug searches, and provider selections—and combined with information available to the recipient—those identifiers provide a reasonable basis to believe the individual can be identified. The allegation is especially concrete for Plaintiff because she was signed into Gmail when her searches were transmitted to Google. *See Kane v. Univ. of Rochester*, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) (holding that the IIHI threshold can be satisfied where transmitted data, though seemingly scrambled, can be decoded by the recipient to identify the individual).

71. The health-related information intercepted from Health First's Website and Enrollment Portal is highly sensitive. It reveals the specific conditions, treatments, and services users are researching; their tobacco use, household composition and income, prescriptions, drug-name searches, and preferred doctors, pharmacies, and hospitals; and the health coverage they are applying for and comparing. The disclosure of this information to advertising and analytics companies exposes users to privacy invasions and to the risk of stigma, discrimination, and targeted exploitation.

72. HIPAA criminalizes the knowing disclosure of individually identifiable health information in violation of HIPAA, with enhanced penalties where the offense is committed with intent to sell, transfer, or use the information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. Health First did not allegedly deploy or procure the Trackers merely for passive website maintenance. The Trackers were allegedly selected and used to obtain advertising, analytics, conversion-measurement, retargeting, audience-building, and lead-generation benefits by transmitting substantive health and coverage communications to third parties. Those facts support the inference that a purpose of the challenged interception was to disclose and use individually identifiable health information for commercial advantage and that the alleged HIPAA offense was independent of the interception prohibited by ECPA.

73. Health First did not obtain HIPAA-compliant authorizations from users for the alleged disclosures. To the extent Health First contends that any Third-Party Recipient acted as its business associate for any challenged tracking function, the existence, scope, and terms of any Business Associate Agreement are facts particularly within Health First's and that recipient's possession. On information and belief, no agreement or other arrangement authorized the Third-Party Recipients to receive and use the challenged information for their own advertising, profiling,

retargeting, or other independent commercial purposes, and a Business Associate Agreement would not itself authorize uses or disclosures outside HIPAA's permitted scope.

74. Health First had actual and constructive knowledge that its deployment of third-party trackers on its Website violated HIPAA. In December 2022, and as updated in March 2024, the U.S. Department of Health and Human Services, Office for Civil Rights, issued guidance expressly warning HIPAA-covered entities and business associates that the use of third-party tracking technologies on websites—including pixels and analytics tools—that transmit PHI to third-party vendors without a valid Business Associate Agreement constitutes an unauthorized disclosure in violation of HIPAA. Health First, which publishes its own privacy materials and holds itself out as handling health information subject to HIPAA, cannot credibly claim ignorance of this well-publicized federal guidance. Health First's continued deployment of the Trackers reflects a knowing and deliberate choice to prioritize advertising and analytics benefits over its legal obligations.

75. The alleged interceptions do not depend on transmission of IP addresses or generic analytics alone. The captured requests transmit the actual substance of users' communications—their plain-text medical search queries, affirmative coverage-eligibility responses, provider selections, prescriptions, drug searches, and plan interactions—together with persistent cookies or other identifiers capable of linking those communications to the same browser, device, member, account, or user. These facts support the allegation that the challenged disclosures involved individually identifiable health information and that a purpose of the interception was the independent, allegedly unlawful disclosure and use described above.

**J. Plaintiff's Specific Experience**

76. Plaintiff Taylor Hunter is a 25-year-old Florida resident who suffers from autonomic dysfunction, also known as dysautonomia, a neurological condition. Beginning in or around July 2024, and on more than one occasion, Plaintiff visited the Website to research her condition and to locate a provider to treat it, including in or around December 2024. Plaintiff accessed the Website from Florida using the Safari web browser on her personal Apple device (an iPhone 12 or MacBook Pro). Although Plaintiff sometimes uses her browser's private or "incognito" mode, she did not do so for these searches, and she did not use ad blockers or a virtual private network, meaning the Trackers embedded on the Website were fully operational during her visits.

77. Before interacting with the Website, Plaintiff was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose her searches or health-related browsing information to the Third-Party Recipients.

78. During her visits, Plaintiff entered plain-text medical search queries into the Website's search bar, including searches for "dysautonomia" and "autonomic dysfunction" and searches to locate a neurologist to treat her condition. In doing so, Plaintiff disclosed information concerning her health condition and care needs and the specific medical services and providers she was seeking. In the same manner documented above in Figures 1 through 5, those search-bar communications—encoded in the page URL—were intercepted in real time and transmitted to the Third-Party Recipients that receive search-bar communications, including Google, Microsoft, Constant Contact, and DataXu, together with Plaintiff's identifying cookies, all without Plaintiff's knowledge or consent.

79. At the time of her searches, Plaintiff was signed into her Google (Gmail) account. As a result, the Google advertising cookies transmitted alongside her search queries linked those communications to her authenticated Google identity.

80. After using the Website's search function to identify a provider, Plaintiff located a Health First physician and logged into the Health First patient portal to obtain treatment for her condition. Plaintiff is a Health First patient. Her use of the Website and its search function, together with Health First's own records, corroborate the interceptions alleged herein.

81. Because Health First deployed the Trackers on its Website, the Third-Party Recipients intercepted and received Plaintiff's sensitive health-related and personal information and electronic communications without her knowledge or consent. At no time did Plaintiff consent to the interception of her communications with Defendant through the Website by the Third-Party Recipients, or to Defendant enabling those companies to access or intercept such information. Plaintiff reasonably expected that her communications with Defendant were solely between herself and Defendant and would not be transmitted or disclosed to third parties.

**INJURY TO PLAINTIFF AND CLASS MEMBERS**

82. Health First's procurement of the unauthorized interception of Website user communications has caused actual harm to Plaintiff and Class Members in multiple ways.

83. **Invasion of Privacy.** The health-related and personal information disclosed through users' medical search queries, coverage-eligibility disclosures, provider selections, and plan interactions—including the specific conditions, treatments, prescriptions, and coverage users research for themselves or their loved ones—is among the most private information an individual possesses. Its interception and disclosure to advertising and analytics companies can result in significant embarrassment, stigma, and discrimination. Plaintiff and Class Members have suffered

an invasion of privacy through the unauthorized interception of their electronic communications and health-related disclosures, violating their reasonable expectation that their interactions with Health First would remain private.

84. **Commercial Exploitation and Loss of Control.** Health First allegedly caused Plaintiff's and Class Members' sensitive communications to be disclosed to advertising and analytics recipients and used the resulting data flows to obtain advertising, measurement, audience, lead-generation, and enrollment benefits. Plaintiff and Class Members thereby lost control over information they had communicated for the limited purpose of seeking health information, care, providers, or coverage. In today's digital economy, personal data—especially health-related information—has significant commercial value, as demonstrated by Health First's own use of that data for advertising, analytics, and lead generation

85. **Diminished Confidence in Healthcare Privacy.** The unauthorized interception of Plaintiff's and Class Members' communications has undermined their ability to freely and confidentially seek medical information, research care and coverage options, and arrange care for themselves and their loved ones without fear that their activities and disclosures are being intercepted by third parties.

86. **Risk of Further Use of Intercepted Data**. Once intercepted by the Third-Party Recipients, Plaintiff's and Class Members' data is beyond their control and may be further processed, combined with other data, and used for advertising and profiling purposes. The resulting harm is ongoing and concrete. By receiving information revealing that a particular user searched for or expressed interest in specific medical conditions, treatments, providers, or health plans, an advertising platform can associate that health-related interest with the user or the user's browsing profile and use it to deliver targeted advertising over time. Such continued use increases

the commercial value of the intercepted data to the Third-Party Recipients by enabling more personalized advertising and increasing the likelihood of user engagement and conversion.

87. **Statutory Injury.** Independent of the above harms, Health First's violations of the FSCA and ECPA have caused Plaintiff and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

88. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

89. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who visited Health First's Website (www.hf.org) or its co-branded health-plan Enrollment Portal (healthfirst.healthsherpa.com) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Health First, including Google Ads, Google Analytics, the Microsoft/Bing advertising tag, the LinkedIn Insight Tag, Constant Contact, and/or DataXu, within the applicable statute of limitations period (the "Nationwide Class").

90. The Florida Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in Florida who visited Health First's Website (www.hf.org) or its co-branded health-plan Enrollment Portal (healthfirst.healthsherpa.com) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Health First, including Google Ads, Google Analytics, the Microsoft/Bing advertising tag, the LinkedIn Insight Tag, Constant Contact, and/or DataXu, within the applicable statute of limitations period (the "Florida Class").

91. Together, the Nationwide Class and the Florida Class are referred to as the "Class."

92. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) the Third-Party Recipients (Google, Microsoft, LinkedIn, Constant Contact, and Roku/DataXu), and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family

members and staff, and the attorneys for the parties and their staff; and (e) any jurors assigned to this case.

93. Plaintiff reserves the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

94. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Health First operates one of Central Florida's largest health systems, and its Website receives hundreds of thousands of unique visitors each month. Based on Website-traffic data, the Website receives approximately 482,000 visits per month—approximately 5.78 million visits per year—and its co-branded Enrollment Portal separately captures the coverage-eligibility disclosures of users applying for Health First Health Plans. The number of individuals whose communications were intercepted by the Trackers during the relevant period is estimated to be in the hundreds of thousands. The precise number and identities of Class Members are within Defendant's and the Third-Party Recipients' records.

95. **Ascertainability.** The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. Health First's web-server logs, the Enrollment Portal's records, Google Ads and Google Analytics account data, Microsoft account data, LinkedIn account data, Constant Contact records, and DataXu/Roku records contain records of visitors to the Website and the Enrollment Portal whose electronic communications were intercepted by the Trackers during the applicable limitations period, including IP addresses, cookie identifiers, timestamps, and the specific pages, searches, and form interactions involved. In addition, Health First collects names, contact information, and inquiry and application details from users who interact with the Website's search function and the

Enrollment Portal's coverage-application and contact functions, providing objective, reliable means of identifying Class Members.

96. **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Health First implemented the Trackers on its Website;

(b) Whether the Trackers intercepted Website users' electronic communications;

(c) Whether Health First procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d) Whether Health First obtained Website users' consent to procure the interception of their electronic communications;

(e) Whether Health First's conduct violated Fla. Stat. § 934.03;

(f) Whether Health First's conduct violated 18 U.S.C. § 2511;

(g) Whether Health First breached a duty of confidence owed to Plaintiff and Class Members;

(h) Whether Health First has been unjustly enriched through its conduct;

(i) Whether Plaintiff and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(j) Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief.

97. These common questions predominate over individualized issues because Plaintiff challenges a centralized course of conduct: Health First's alleged deployment or procurement of

tracking on functions that solicit substantive health, provider, prescription, eligibility, and coverage communications. Liability can be addressed through common technical and documentary proof concerning the code and configurations used on each challenged function, the categories of contents transmitted, the recipients and identifiers involved, Health First's role in procuring or authorizing the transmissions, and the disclosures or consent mechanisms presented to users.

98. Individualized questions concerning a member's qualifying communication, the Tracker that acquired it, or the date of interception can be addressed through records and objective class criteria and do not necessarily overwhelm the common questions concerning Health First's challenged tracking configurations, procurement, and consent practices. Plaintiff reserves the right to propose subclasses, function-specific groupings, or certification of particular common issues if discovery shows material differences among the search and enrollment workflows or among recipients.

99. **Typicality.** Plaintiff's claims arise from the alleged course of conduct challenged on behalf of the Class: Health First's deployment or procurement of third-party tracking that contemporaneously acquired substantive health-related communications without valid consent. Plaintiff personally used hf.org to send literal medical-condition and provider searches that were allegedly transmitted with persistent identifiers to multiple Third-Party Recipients. Her claims thus present the same procurement, contents, interception, consent, and injury theories as the Class, even though particular Class Members may have used different functions within the integrated Website and Enrollment Portal workflow or had communications acquired by a different subset of the identified Trackers.

100. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests adverse or antagonistic to those of the Class, and has retained counsel

experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiff's counsel have the resources, expertise, and commitment to prosecute this action vigorously through discovery, class certification, trial, and any appeals.

101. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. Prosecution of separate actions would create a risk of inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

102. **Injunctive and Declaratory Relief.** Health First has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2).

103. **Issue Certification.** Alternatively, Plaintiff seeks certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Security of Communications Act
### (Fla. Stat. § 934.03)
### (On Behalf of Plaintiff and the Florida Class)

104. Plaintiff incorporates paragraphs 1–103 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Florida Class.

105. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

106. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was "designed to protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

107. The Trackers deployed on Health First's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively intercept and transmit the contents of users' communications, including users' plain-text medical search queries, coverage-eligibility disclosures, provider and plan selections, and condition-specific browsing.

108. The transmissions between Plaintiff and Class Members and Health First's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

109. The Trackers intercept the "contents" of Plaintiff's and Class Members' electronic communications, not merely routing or addressing information. The specific search queries, coverage-eligibility disclosures, provider and plan selections, and structured survey responses

transmitted to the Third-Party Recipients plainly concern the "substance, purport, or meaning" of the user's communication within the meaning of Fla. Stat. § 934.02(7). Likewise, the URLs of the service, condition, provider, and coverage pages a user visits—and the plain-text search terms embedded in those URLs—encode the specific medical services and conditions being researched and therefore constitute "contents" rather than mere routing information. *See W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *4–5 (holding that URLs reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.,* 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (URLs may constitute "contents" where they reveal substantive information about a user's activity). Health First's conduct is readily distinguishable from the collection of "basic analytic data" in a "generic commercial setting" at issue in *Jacome v. Spirit Airlines, Inc.,* 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), because the data intercepted here is confidential, health-related information the FSCA was enacted to protect.

110. Health First intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiff and Class Members did not consent to this interception.

111. As a direct result of Health First's violations, Plaintiff and Class Members are entitled to: (a) actual damages, or liquidated statutory damages computed at the higher of $100 per day for each day of violation or $1,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs of litigation. Fla. Stat. § 934.10.

112. Plaintiff and Class Members are also entitled to injunctive relief to prevent Health First from continuing to deploy the Trackers to intercept their electronic communications without proper consent.

**COUNT II**
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. § 2511 et seq.)**
**(On Behalf of Plaintiff and the Nationwide Class)**

113. Plaintiff incorporates paragraphs 1–103 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Nationwide Class.

114. The ECPA prohibits the intentional interception of electronic communications and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

115. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

116. The transmissions between Plaintiff and Class Members and Health First's Website are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce, and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

117. The Trackers intercepted the "contents" of Plaintiff's and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

118. Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply where a communication is intercepted for the purpose of committing a criminal or tortious act in violation of federal or state law. Health First allegedly procured these interceptions at least in part for the purpose of disclosing and using users' individually identifiable health information through third-party advertising and analytics systems to obtain commercial advantages, including conversion measurement, retargeting, audience

building, lead generation, care referrals, and coverage enrollments. The same alleged disclosure and use of individually identifiable health information—separate from the act of interception itself—violated HIPAA's criminal prohibition where undertaken knowingly and with intent to transfer or use the information for commercial advantage. 42 U.S.C. § 1320d-6. That same disclosure independently constituted the tort of breach of confidence, as alleged in Count III below. The captured transmission of literal medical searches and affirmative enrollment responses with persistent identifiers, the placement of advertising technologies on functions soliciting those communications, Health First's privacy representations, and its continued receipt of marketing and enrollment benefits support the inference of that unlawful purpose. Whether Health First possessed that purpose and the requisite knowledge is a fact-intensive issue that should be resolved on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush Sys. for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023).

119. Health First's knowing violation of HIPAA is supported by, among other things, its own publication of privacy materials and its awareness of the HHS Office for Civil Rights guidance warning that tracking technologies on healthcare websites that transmit PHI without a valid Business Associate Agreement violate HIPAA.

120. That Health First may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein,* 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

121. Health First intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the

meaning of 18 U.S.C. § 2511(1)(a). Users did not consent to Health First's procurement of third-party interception or to the sharing of their medical search queries, coverage-eligibility disclosures, provider and plan selections, and associated identifiers for advertising, analytics, retargeting, or conversion-optimization purposes.

122. Health First was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

123. As a direct result of Health First's violations, Plaintiff and Class Members are entitled to: (a) actual damages, or statutory damages of the greater of $100 per day per violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs. 18 U.S.C. § 2520.

**COUNT III**
**Breach of Confidence**
**(On Behalf of Plaintiff and the Nationwide Class)**

124. Plaintiff incorporates paragraphs 1–103 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Nationwide Class.

125. A common law breach of confidence claim requires an "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc). The claim "is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved," and traditionally arises in the context of close professional relationships, such as those between patients and medical providers. *Id.*

126. Under Florida law, a confidential relationship exists where "confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused."

*Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). Whether a confidential relationship exists is typically a question of fact not appropriately resolved on a motion to dismiss.

127. A confidential relationship existed between Health First and Plaintiff and Class Members. Health First holds itself out as an integrated health system that furnishes medical care and health coverage, publishes privacy materials representing that it safeguards the information users submit, and invites users to disclose their symptoms, conditions, care needs, prescriptions, provider preferences, and coverage and eligibility information through the Website and the Enrollment Portal for the purpose of obtaining care and coverage. Users reposed confidence in Health First when making those disclosures, and Health First accepted that trust. Plaintiff's relationship with Health First extended well beyond a single interaction with a public-facing website: she used the Website on more than one occasion over a period of months to research her neurological condition and to locate a provider to treat it, she identified a Health First physician through the Website, she logged into the Health First patient portal to obtain treatment for that condition, and she is a Health First patient.

128. The information Health First disclosed is nonpublic. It includes Plaintiff's and Class Members' plain-text medical search queries identifying the conditions, treatments, services, and providers they were researching; the structured health and eligibility information they entered in the Enrollment Portal, including age, sex, tobacco use, household income, changes in household size, and qualifying life events; their disclosed prescriptions and drug-name searches; their preferred doctors, pharmacies, and hospitals; their plan comparisons and selections; and the URLs encoding the specific medical services, conditions, providers, and coverage options they viewed. None of this information was publicly available. It existed only because users affirmatively

communicated it to Health First, and Health First learned it within the confidential relationship described above.

129. Health First disclosed that nonpublic information to third parties. By deploying or procuring the Trackers on the Website and the Enrollment Portal, Health First caused users' communications to be transmitted in real time to the Third-Party Recipients—Google, Microsoft, LinkedIn, Constant Contact, and DataXu/Roku—together with persistent cookies and identifiers permitting those recipients to link the communications to the same browser, device, member, account, or user. The Third-Party Recipients are advertising and analytics companies that play no role in furnishing users' medical care or coverage, and they received the information for their own independent commercial purposes. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *8 (M.D. Fla. Mar. 6, 2025) (allegations that tracking technologies gathered and transmitted a plaintiff's protected health information, including searches for physicians, medical conditions, and treatment-related information, to Meta and Google sufficiently stated a claim for breach of confidence).

130. The disclosures were unconsented and unprivileged. Plaintiff and Class Members were never presented with a cookie banner, pop-up, checkbox, clickwrap, or any other affirmative request for permission before their communications were transmitted, and they never authorized Health First to disclose their health-related communications to advertising and analytics companies. Health First's footer-linked Privacy Policy did not obtain consent and represented the opposite—that Health First does not use the information users send it for marketing purposes without their knowledge and express consent. No privilege, authorization, or other legal justification permitted these disclosures; to the contrary, HIPAA prohibited them, and Health First obtained no HIPAA-compliant authorization from any user.

131. Health First breached the confidence reposed in it. It made the deliberate decision to deploy or procure the Trackers on precisely those functions through which users disclose sensitive health, provider, prescription, eligibility, and coverage information, and it did so with knowledge—including from the HHS Office for Civil Rights guidance described above—that doing so transmits protected health information to third-party vendors in violation of its legal and ethical obligations. Health First could have declined to place tracking technologies on those functions. Instead it maintained them and accepted the advertising, analytics, attribution, audience, lead-generation, referral, and enrollment benefits the disclosures produced.

132. As a direct and proximate result of Health First's breach of confidence, Plaintiff and Class Members have been injured. They suffered an invasion of privacy, lost control over their confidential health information, sustained a diminished ability to seek medical information, care, and coverage in confidence, and face the ongoing risk that the disclosed information will be further processed, combined with other data, and used for profiling and targeted advertising. Plaintiff and Class Members are entitled to compensatory and nominal damages, and to injunctive relief prohibiting Health First from further disclosing their confidential information without consent.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

133. Plaintiff incorporates paragraphs 2–4, 10, 12–13, 19–60, 76, 78, 80, 84, and 88–103 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Nationwide Class. This Count does not incorporate ¶¶ 61–65, ¶¶ 66–75, or the Counts I–III injuries because this Count does not depend on any of them.

134. Plaintiff pleads this Count in the alternative to Counts I, II, and III, and to the extent Plaintiff and Class Members are found to have no adequate remedy at law. This Count does not

rely on Health First's statutory violations or its breach of confidence to supply the unjust factor. It rests instead on the independent equitable principle that Health First solicited, received, and retained the benefit of Plaintiff's and Class Members' valuable personal and health-related data without conferring any compensation in return, and that retaining that benefit without paying its fair value is inequitable irrespective of whether the conduct that produced it is ultimately adjudged unlawful.

135. Health First received a benefit from Plaintiff and Class Members by inducing them to provide valuable personal and health-related data through the Website's search, coverage-application, plan-comparison, provider-selection, and contact functions, and then putting that data to use for its own commercial purposes.

136. By implementing the Trackers on its Website, Health First obtained analytics, conversion measurement, retargeting, audience-building, advertising attribution, and lead-generation benefits. Those benefits enabled Health First to qualify and route leads, improve advertising efficiency, and increase the volume of care referrals, coverage enrollments, and services, thereby enriching itself at the expense of Plaintiff and Class Members.

137. Private information, at least in the context of sensitive health-related information, has value. *See W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *10.

138. Health First knowingly accepted and retained the advertising, analytics, attribution, audience, lead-generation, referral, and enrollment benefits produced through the challenged transmissions. Health First has never compensated Plaintiff or Class Members for the data that generated those benefits, and it would be inequitable for Health First to retain the value it received without paying fair value for it.

139. Because Health First retained a benefit conferred by Plaintiff and Class Members without paying its fair value, Plaintiff and Class Members are entitled to restitution and disgorgement of the profits, benefits, and other compensation Health First obtained from the use of their personal and health-related data.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all other Class Members similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

(b) Declare that Health First's actions, as described herein, violate the FSCA and the ECPA and constitute a breach of confidence and unjust enrichment;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class statutory damages as provided by the FSCA and the ECPA;

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation Health First obtained from the use of Plaintiff's and Class Members' personal and health-related data;

(g) Award injunctive relief requiring Health First to cease procuring the interception of Website users' communications without proper consent; to disable or segregate the Trackers from its search, coverage-application, plan-comparison, provider-selection, and other health-related functions unless valid consent and authorization

are obtained; to request deletion of improperly transmitted data from the Third-Party Recipients to the extent within Health First's control or contractual rights; and to implement appropriate safeguards to protect Website users' privacy in the future;

(h) Award Plaintiff and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiff and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: August 13, 2026

Respectfully submitted,

*By: /s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
SCHWARTZBAUM
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email:
admin@schwartzbaum.com

*Counsel for Plaintiff and the Proposed Class*